Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/01/2021 09:10 AM CDT

Brian Beckner, Special Fiduciary of the Testamentary
Trust Established Under Item Five of the Last Will
and Testament of Francis R. Urban, also known as
The Francis R. Urban Family Trust, and Janet K.
Neujahr, Personal Representative of the
Estate of Lola R. Urban, deceased,
appellees and cross-appellants, v.
Richard D. Urban, appellant
and cross-appellee.

___ N.W.2d ___

Filed July 9, 2021.    No. S-20-345.

1. **Limitations of Actions: Appeal and Error.** The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.
2. **Statutes.** Statutory interpretation presents a question of law.
3. **Appeal and Error.** On a question of law, an appellate court reaches a conclusion independently of the court below.
4. **Specific Performance: Equity.** An action for specific performance sounds in equity.
5. **Foreclosure: Equity.** An action to foreclose on real estate is an action in equity.
6. **Ejectment: Pleadings: Equity: Appeal and Error.** In an ejectment action, where defendant presents an equitable defense, the case is tried, and reviewed, as an action in equity.
7. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.

8. **Limitations of Actions.** The period of limitations begins to run upon the violation of a legal right, that is, when an aggrieved party has the right to institute and maintain suit.

9. **Ejectment.** The essential elements of an action for ejectment are legal estate, a right of possession in the plaintiff, and unlawful detention by the defendant.

10. **Contracts: Vendor and Vendee: Equity.** Where a contract is made for the sale of real estate, equity treats the vendor as the trustee of the purchaser for the land, and the purchaser as the trustee of the purchase money for the vendor.

11. **Contracts: Real Estate: Vendor and Vendee.** In an executory contract for the sale of real estate, the vendor retains the legal title to secure the payment of the unpaid purchase money.

12. **Contracts: Real Estate: Vendor and Vendee: Liens.** The claim of a vendor in a land contract is but an ordinary money debt, secured by the contract, and his or her proceedings to enforce the lien upon the land should be governed by the analogies of proceedings to enforce other equitable liens, and be executed by a sale, to satisfy the amount due.

13. **Contracts: Real Estate: Sales: Title.** Where the owner of real estate enters into a contract of sale, retaining legal title until purchase money is paid, the ownership of the realty passes to and vests in the purchaser, and the interest or estate acquired by the buyer is land, and the rights conferred by the contract upon and vested in the seller are personal property.

14. ____: ____: ____: ____. The net result of an installment contract is that the seller holds the legal title in trust for the buyer.

15. **Contracts: Real Estate: Vendor and Vendee.** The vendee under a land sale contract has acquired an interest in the property that must be extinguished before the vendor can resume possession, notwithstanding whether a provision in the contract provides that in the event of the vendee's uncured default, the vendor has the right to declare the contract terminated and repossess the premises.

16. **Adverse Possession: Title: Proof: Time.** A party claiming title through adverse possession must prove by the greater weight of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years.

17. **Adverse Possession.** Where one enters into and holds possession of land under an executory contract of purchase or bond for title, his entry and possession are in subordination to, and not adverse to, the rights of the vendor or of those holding under him or her.

18. **Contracts: Vendor and Vendee.** Where the entry upon land is under an executory contract of purchase or bond for title, the possession of the vendee retains its subordinate character until payment or performance of all conditions by the vendee or until the vendee surrenders the possession which he or she has had under the agreement or until he or she has distinctly and unequivocally repudiated the title of the vendor and such repudiation has been brought either expressly or by legal implication to the vendor's knowledge, or until execution of a conveyance by the vendor to the vendee terminating the executory character of their relationship.

19. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the case and controversy before it.

Appeal from the District Court for Polk County: RACHEL A. DAUGHERTY, Judge. Reversed and remanded with direction.

George H. Moyer, of Moyer, Moyer & Lafleur, for appellant.

David J. Skalka, of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., for appellees.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

CASSEL, J.

## I. INTRODUCTION

In this appeal, we must determine whether the sellers under an installment land contract may employ an ejectment action—not to recover possession of the land to enforce a forfeiture clause, but, rather, to foreclose the buyer's equitable title where the remedy of foreclosure was itself barred by the applicable statute of limitations.[1] Under the circumstances before us, the statute of limitations and the doctrine of adverse possession precluded the use of ejectment. We reverse the judgment of the district court and remand the cause with direction to dismiss the action.

---

[1] See Neb. Rev. Stat. § 25-202 (Reissue 2016).

## II. BACKGROUND

### 1. Contract

In 1980, Francis R. Urban and his wife, Lola R. Urban, sold a quarter section of land in Polk County, Nebraska, to their son, Richard D. Urban, by means of an installment land contract. Under the contract, Francis and Lola were to deliver possession of the land to Richard "coincidental with the execution" of the contract. There is no dispute that Richard has been in possession since that time.

The contract required a downpayment and 20 annual installment payments, including interest at 8½ percent per annum, commencing in March 1981. Thus, the last payment under the contract was due in March 2000. The contract also required Richard to pay the 1979 and subsequent real estate taxes.

The contract included provisions for Francis and Lola's remedies upon default, as follows:

If [Richard] shall fail to make any payments of principal or interest within ninety (90) days after the same becomes due, or fail to pay any real property taxes . . . before the same becomes delinquent, or to do or perform any of the other terms, provisions or promises required to be done or performed . . . under this Agreement, [Francis and Lola] may, at their option:

1. Declare all principal and interest due and payable immediately and may proceed to foreclose the interest of [Richard] under this Agreement;

2. Recover actual damages sustained by [Francis and Lola] which would include, but not necessarily be limited to, all expenses incurred by [Francis and Lola] in connection with this transaction, together with interest at the rate of 12 1/2% per annum after default until such damages shall have been paid; or

3. Pursue any other remedy to which [Francis and Lola] might be entitled at law or equity.

[Richard] hereby expressly waives any and all statutory stays, homestead claims and surviving spouse's claims.

The contract also stated that "installments shall bear interest at the rate of 12 1/2% per annum after due until paid." At the time of the contract, Francis and Lola placed a deed in escrow for delivery to Richard "upon [Richard's] full performance."

In 1997, Francis died and his interest in the contract was assigned to his testamentary trust. Lola initially served as trustee of that trust.

At some point, the original escrowed deed was lost. In December 2018, Lola, acting as trustee of Francis' testamentary trust, executed a new deed and unilaterally delivered it to a different escrow agent. Richard claims to have never consented to that act.

## 2. Richard's Improvements

After Richard took possession of the property, he made several improvements. Richard leveled the property; removed native trees and bushes; placed a double-wide residential trailer, a machine shed, and grain storage bins on the property; and drilled four irrigation wells. According to Richard's testimony, he believed that the improved 146-acre property was worth approximately $7,000 per acre—a significant increase from the installment contract's purchase price of approximately $638.75 per acre.

## 3. Lawsuit

In 2018, Lola, as trustee of Francis' testamentary trust and as an individual, filed suit against Richard in the district court for Polk County. The suit asked the court to compel Richard to specifically perform his obligations under the contract. Lola requested that if Richard failed to pay the balance owed within 20 days, the court order the property be foreclosed.

Richard filed an answer claiming, among other things, that he had adversely possessed the property for the statutorily mandated period.

After Richard filed his answer, Lola sought and was granted permission to amend her complaint by interlineation to assert an alternative claim for ejection of Richard from the property,

including the allegations specified by statute.[2] Richard then filed an amended answer.

## 4. Bench Trial

The matter was tried to the bench. By the time of trial, Janet K. Neujahr was acting as Lola's agent pursuant to a power of attorney. We summarize the evidence regarding Richard's payments, events which occurred after the last installment due date, and calculations of the amount outstanding.

### (a) Payment History

The parties dispute the balance due on the contract. Lola presented bank statements and a payment ledger. These documents purported to show that Richard failed to pay the entire downpayment before taking possession, regularly underpaid yearly installments, skipped yearly payments entirely in 1993 through 1995 and 1997, and made no further payments after 2001.

Richard refuted Lola's depiction of his payment history and the amount he owed. Richard presented a document that Francis and Lola's accountant drafted two decades earlier, which indicated that Richard paid a large sum in 1991. However, the accountant testified in his deposition, which was admitted into evidence at trial, that he had no recollection of preparing the document. Richard also testified that he did not recall making that payment. In fact, Richard had no independent recollection of making payments on the contract besides what Lola asserted and did not present any other evidence to refute Lola's depiction of his payment history.

Richard testified that when he made the payment in 2001, he believed that he had paid the total amount due. Richard stated that he demanded the deed from Lola on two separate occasions—in 1999 or 2000, and again in 2001. He admitted

---

[2] See Neb. Rev. Stat. § 25-2124 (Reissue 2016) (plaintiff has legal estate; plaintiff is entitled to possession, describing real property; and defendant unlawfully keeps plaintiff out of possession).

that he knew he still had payments to make under the contract the first time he demanded the deed, but asserted that when he demanded the deed the second time, he did not believe he owed any more money. The district court's judgment did not address or make any findings regarding this portion of Richard's testimony.

### (b) Events After Final
### Installment Due Date

After Richard discontinued payments in 2001, Lola did not demand a payment from Richard until 2014. Richard never responded to Lola's payment demand.

In 2016, Richard and his siblings discussed the contract at a family meeting regarding Lola's finances. Neujahr proposed selling a portion of Lola's land to pay for Lola's long-term care. Richard protested the idea and said that he would pay Lola what he owed on the contract to cover Lola's expenses, although he did not know how much he owed.

Following the 2016 meeting, Neujahr—acting under a power of attorney conferred by Lola's power of attorney—informed Richard of the amount she believed he owed on the contract. Richard never responded, resulting in Lola's filing the lawsuit in 2018.

### (c) Calculations

At the bench trial, the parties presented evidence regarding the amount Richard owed on the contract. Lola submitted a calculation considering the contractual terms, Richard's payment history, and the accrued interest on the overdue yearly payments. Notably, because Richard did not pay the entire downpayment in 1980, Lola applied Richard's installment payments first to the downpayment and then to the subsequently overdue installment balance. According to this calculation, Richard owed $677,023.90 as of January 17, 2020. Interest continued to accrue on the contract.

Richard countered Lola's calculations with three different calculations. However, each of his calculations applied the

large payment; applied full payments in 1993, 1994, and 1995; or applied payments to the penalty interest last, even though the contract states that "[p]ayments shall apply first to the payment of interest and secondly to the payment of principal."

## 5. District Court's Judgment

Following the bench trial, the court rendered a thorough 21-page judgment, styled as an order. The court found that § 25-202 barred Lola from foreclosing on the property. Despite having rejected the foreclosure claim, the court found that Lola had superior title to the real estate and was entitled to have Richard ejected from the property.

However, recognizing that Richard's improvements "enhanced the value of the [p]roperty" and that therefore he was entitled to recover the cost of the improvements, the court exercised its equitable powers and ordered a sheriff's sale of the property. The court concluded that this sale would adequately compensate Richard for his improvements. After the sale's costs were paid, the judgment required the remaining proceeds to be paid, first, to Lola to satisfy the balance Richard owed on the contract and the remainder paid to him. Finding that the contract unambiguously stated that all payments must be applied first to all interest and then to the principal, the court ruled that the balance Richard owed was $686,183.33.

Shortly after the judgment was entered, Lola moved to amend the judgment regarding costs of the action. The court did so.

## 6. Appeal

Richard filed a timely appeal. He also posted a supersedeas bond, in the amount specified by the district court, to stay the proceeding pending disposition of the appeal.

Shortly before Richard filed his brief on appeal, Lola died. Brian Beckner, as special fiduciary of Francis' trust, and Neujahr, who had been appointed as personal representative of Lola's estate (collectively the successors), were substituted as parties to represent the trust and the estate respectively.

When Richard filed his initial brief, he also petitioned this court to bypass the Nebraska Court of Appeals.[3] Although we overruled Richard's petition to bypass, we moved the appeal to our docket.[4] Although Beckner died shortly before submission of the appeal, we determined that a statute allowed the appeal to proceed.[5]

## III. ASSIGNMENTS OF ERROR

### 1. Appeal

Richard assigns, reordered and consolidated, that the district court erred by (1) failing to apply § 25-202 to bar Lola's action in ejectment, (2) failing to apply the "Occupying Claimants Act"[6] and conduct an appraisal to determine the value of the lasting improvements that he made to the real estate, (3) finding the amount due on the contract was $686,183.33, and (4) failing to calculate the amount due on the contract by measuring the rents and profits for the 4 years prior to Richard's receiving the summons.

### 2. Cross-Appeal

The successors assign that the district court erred by finding that Lola's claim for specific performance of the contract was barred by § 25-202.

## IV. STANDARD OF REVIEW

[1] The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.[7]

---

[3] See Neb. Rev. Stat. § 24-1106(2) (Cum. Supp. 2020).

[4] See § 24-1106(3).

[5] See Neb. Rev. Stat. § 25-1403 (Reissue 2016).

[6] See Neb. Rev. Stat. §§ 76-301 to 76-311 (Reissue 2018).

[7] *Colwell v. Mullen*, 301 Neb. 408, 918 N.W.2d 858 (2018).

[2,3] Statutory interpretation presents a question of law.[8] On a question of law, an appellate court reaches a conclusion independently of the court below.[9]

[4-7] An action for specific performance sounds in equity.[10] Likewise, an action to foreclose on real estate is an action in equity.[11] In an ejectment action, where defendant presents an equitable defense, the case is tried, and reviewed, as an action in equity.[12] On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.[13]

## V. ANALYSIS

Because of the nature of the assigned errors on appeal and cross-appeal, we first address the issue raised in the successors' cross-appeal and then proceed to those raised by Richard on appeal.

### 1. Cross-Appeal

In the successors' cross-appeal, they assign that the court erred in finding that Lola's claim for specific performance of the contract was barred by § 25-202. The successors argue the statute of limitations did not start accruing until 2018, when Lola threatened to foreclose on the property.

[8] The period of limitations begins to run upon the violation of a legal right, that is, when an aggrieved party has the right to institute and maintain suit.[14] Section 25-202(1) mandates that "[a]n action for the recovery of the title or possession of

---

[8] *Walters v. Sporer*, 298 Neb. 536, 905 N.W.2d 70 (2017).

[9] *Id.*

[10] See *id.*

[11] *Mutual of Omaha Bank v. Watson*, 297 Neb. 479, 900 N.W.2d 545 (2017).

[12] *Miller v. Radtke*, 230 Neb. 561, 432 N.W.2d 542 (1988).

[13] *County of Cedar v. Thelen*, 305 Neb. 351, 940 N.W.2d 521 (2020).

[14] *Lindner v. Kindig*, 293 Neb. 661, 881 N.W.2d 579 (2016).

lands, tenements, or hereditaments, or for the foreclosure of mortgages or the foreclosure of deeds of trust as mortgages thereon, can only be brought within ten years after the cause of action accrues." With regard to installment contracts—in the absence of a contractual provision allowing acceleration where an obligation is payable by installments—the statute of limitations runs against each installment individually from the time it becomes due.[15]

We have previously held that installment land contracts are to be treated as mortgages.[16] A mortgagee is required to bring its action within 10 years of the date the debt secured by the mortgage matured unless, of course, the statute of limitations had been tolled.[17] One such tolling statute is Neb. Rev. Stat. § 25-216 (Reissue 2016), which states:

> In any cause founded on contract, when any part of the principal or interest shall have been voluntarily paid, or an acknowledgment of an existing liability, debt or claim, or any promise to pay the same shall have been made in writing, an action may be brought in such case within the period prescribed for the same, after such payment, acknowledgment or promise . . . .

Here, because the installments were never accelerated, the final year in which the statute of limitations began to accrue was 2000—when Richard's entire debt matured. However, Richard made a payment on the principal and interest in 2001. Therefore, the 10-year statute of limitations recommenced in 2001. Therefore, Lola's action for specific performance was barred in 2011.

To avoid this result, the successors contend that Richard's payment of property taxes qualified as payments tolling the

---

[15] See *City of Lincoln v. Hershberger*, 272 Neb. 839, 725 N.W.2d 787 (2007). See, also, *Becker v. Lammers*, 193 Neb. 839, 229 N.W.2d 557 (1975).

[16] See *Mackiewicz v. J.J. & Associates*, 245 Neb. 568, 514 N.W.2d 613 (1994).

[17] See *PSB Credit Servs. v. Rich*, 251 Neb. 474, 558 N.W.2d 295 (1997).

statute of limitations under § 25-216. The plain language of the statute and contract defeats this argument. The contract said: "[Richard] shall pay the 1979 real estate taxes and all subsequent taxes levied against the [property]." This contract language did not characterize real estate taxes as either "principal" or "interest." Thus, Richard's tax payments did not qualify as voluntary payments under § 25-216. Nor did Richard, at any time after 2001, acknowledge the existing liability in writing. Therefore, § 25-216 did not toll the statute of limitations and the court did not err in finding that Lola's claim for specific performance of the contract was barred by § 25-202.

## 2. APPEAL

### (a) Ejectment

[9] On appeal, Richard assigns that the court erred by failing to apply § 25-202 to bar Lola's ejectment action. As stated earlier, the period of limitations begins to run upon the violation of a legal right, that is, when an aggrieved party has the right to institute and maintain suit.[18] The essential elements of an action for ejectment are legal estate, a right of possession in the plaintiff, and unlawful detention by the defendant.[19] Therefore, an action for ejectment can be maintained only by one who has both a legal estate in and a right to the immediate possession of the demanded lands.[20]

### (i) Right of Possession

[10] Where a contract is made for the sale of real estate, equity treats the vendor as the trustee of the purchaser for the land, and the purchaser as the trustee of the purchase money

---

[18] See *Lindner v. Kindig, supra* note 14.

[19] *K & K Farming v. Federal Intermediate Credit Bank*, 237 Neb. 846, 468 N.W.2d 99 (1991).

[20] See *Zion Evangelical Lutheran Church v. St. John's Evangelical Lutheran Church*, 75 Neb. 774, 106 N.W. 1010 (1906).

for the vendor.[21] This doctrine rests upon the equitable doctrine that equity considers that done which ought to be done.[22]

[11,12] Thus, in an executory contract for the sale of real estate, the vendor retains the legal title to secure the payment of the unpaid purchase money.[23] In other words, the claim of a vendor in a land contract is but an ordinary money debt, secured by the contract, and his or her proceedings to enforce the lien upon the land should be governed by the analogies of proceedings to enforce other equitable liens, and be executed by a sale, to satisfy the amount due.[24]

[13] Because this court has uniformly recognized that a seller in a land contract retains the title as security for the unpaid purchase money and has an equitable lien on the land to the extent of the debt, a seller has, for all intents and purposes, a purchase-money mortgage.[25] Where the owner of real estate enters into a contract of sale, retaining legal title until purchase money is paid, the ownership of the realty passes to and vests in the purchaser, and the interest or estate acquired by the buyer is land, and the rights conferred by the contract upon and vested in the seller are personal property.[26] In a 1954 decision applying this principle to an installment land contract, we said:

> The interest the vendees acquired was real estate. The right conferred by the contract upon the vendors was personal property. The contract put the vendees in complete possession of the real estate. Their possession was adverse to any right of possession of the vendors. The vendees are in possession as owners and the vendors or

---

[21] *Hendrix v. Barker*, 49 Neb. 369, 68 N.W. 531 (1896).

[22] *Id.*

[23] See *id.*

[24] *Id*.

[25] *Mackiewicz v. J.J. & Associates, supra* note 16.

[26] *Id.*

their successors can never by their own volition alone terminate that possession or ownership.[27]

This line of authority is consistent with the Restatement,[28] which states that "[a] contract for deed creates a mortgage."[29] The Restatement defines a "contract for deed" as a "contract for the purchase and sale of real estate under which the purchaser acquires the immediate right to possession of the real estate and the vendor defers delivery of a deed until a later time to secure all or part of the purchase price."[30] The comments characterize a contract for deed as the most commonly used mortgage substitute.[31] According to the comments, the primary attraction of the contract for deed is that the forfeiture clause ostensibly provides a seller with the right to declare the contract terminated, to regain possession of the real estate, and to retain the purchaser's prior payments as liquidated damages.[32]

But Nebraska law disfavors forfeiture.[33] Thus, ejectment— where the vendee is eliminated from the title, and the vendor acquires title and possession without giving the vendee an opportunity to redeem and without returning payments already made to the vendor—may be granted as a remedy for violating the terms of a land contract only where the equities of the particular case justify such a disposition, where the property is of less value than the contract price, and where such a procedure would not offend against justice and equity.[34]

---

[27] *Buford v. Dahlke*, 158 Neb. 39, 47, 62 N.W.2d 252, 257 (1954).

[28] Restatement (Third) of Property: Mortgages §§ 1.1 through 8.6 (1997).

[29] See *id.*, § 3.4(b) at 154.

[30] See *id.*, § 3.4(a) at 154.

[31] See *id.*, comment *a*.

[32] See *id.*

[33] See *Miller v. Radtke, supra* note 12.

[34] *Id.*

[14,15] Ultimately, the net result of an installment contract is that the seller holds the legal title in trust for the buyer.[35] The buyer in possession, on the other hand, is, for all practical purposes, the owner of the property, with all the rights of an owner, subject only to the terms of the contract.[36] Accordingly, the vendee under a land sale contract has acquired an interest in the property that must be extinguished before the vendor can resume possession, notwithstanding whether a provision in the contract provides that in the event of the vendee's uncured default, the vendor has the right to declare the contract terminated and repossess the premises.[37]

Here, Lola could not seek Richard's ejectment from the property. While Francis and Lola retained legal title, they contracted away their rights to possess the property. The contract did not mandate that Richard forfeited his equitable ownership in the property upon default. Without the right to possess the property, Lola could not seek Richard's ejectment from it.

Even if the contract had contained a forfeiture clause, Nebraska law would not have permitted its enforcement here. The equities would not justify such a disposition in light of Richard's significant improvements to the property and the property value significantly exceeding the contract price.[38] However, our analysis does not end here.

### (ii) Adverse Possession

[16] Richard claims to have adversely possessed the property for the statutorily mandated period under § 25-202. A party claiming title through adverse possession must prove by the greater weight of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive,

---

[35] See *Mackiewicz v. J.J. & Associates, supra* note 16.

[36] *Id.*

[37] *Cloke v. Findlan*, 165 A.D.3d 1545, 86 N.Y.S.3d 774 (2018). See, also, *Luneke v. Becker*, 621 So. 2d 744 (Fla. App. 1993).

[38] See *Miller v. Radtke, supra* note 12.

(4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years.[39]

[17] The successors counter that Richard contractually agreed to possess the property subordinate to Lola's title, and that therefore he could not "adversely" possess the property. In *Leo Egan Land Co., Inc. v. Heelan*[40]—the case upon which the successors primarily rely—we said:

> [W]here one enters into and holds possession of land under an executory contract of purchase or bond for title, his entry and possession are in subordination to, and not adverse to, the rights of the vendor or of those holding under him. In such case a privity exists which precludes the idea of a hostile tortious possession pending the completion of the contract which can silently ripen into title by adverse possession under the statute of limitations. . . . The vendee is equitably estopped from claiming that the possession is adverse.

Our decision in *Heelan* relied on an earlier decision,[41] which in turn cited to a legal encyclopedia.[42] The current version of the encyclopedia retains the essence of the quotation above.[43]

This general authority provides some reasons for the rule. One is the same rule which exists in cases of landlord and tenant—the injustice of allowing a person who has obtained possession by admitting the title of another to enjoy that title and, in case of a failure in a proof of it, to hold the premises himself or herself.[44] Another is the "supposed trust relation which the parties sustain to each other."[45]

---

[39] See *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021).

[40] *Leo Egan Land Co., Inc. v. Heelan*, 210 Neb. 263, 267-68, 313 N.W.2d 682, 685 (1981) (internal quotation marks omitted).

[41] *Gramann v. Beatty*, 134 Neb. 568, 279 N.W. 204 (1938).

[42] See *id.* at 573, 279 N.W. at 206 (citing "2 C. J. S. 672").

[43] See 2 C.J.S., *Adverse Possession* § 144 (2013).

[44] See *id.*

[45] See *id.* at 649.

[18] Yet, the mere relationship of vendor and vendee does not of itself preclude a purchaser from holding adversely to the seller.[46] The court in *Heelan* recognized the following:

> Where the entry [upon land is under an executory contract of purchase or bond for title], the possession [of the vendee] retains its subordinate character until payment or performance of all conditions by the vendee or until he surrenders the possession which he has had under the agreement or until he has distinctly and unequivocally repudiated the title of his vendor and such repudiation has been brought either expressly or by legal implication to the vendor's knowledge, or until execution of a conveyance by the vendor to the vendee terminating the executory character of their relationship.[47]

Further, laches of holders of encumbrances in asserting their rights has long received legislative recognition in the form of limitation statutes.[48] In Nebraska, that statute is § 25-202. Consequently, a seller under an installment contract, who has received a distinct and unequivocal repudiation of the contract by the buyer, cannot wait more than 10 years before commencing an ejectment action.[49]

Here, the evidence shows the necessary repudiation. Originally, Richard agreed to possess the property subordinate to, and not adversely to, Lola's title. However, in 2001, Richard demanded the deed from Lola because he believed that the contract was completed. This demand was a distinct and unequivocal statement by Richard that he no longer agreed to possess the property in a subordinate nature. At that time, Richard's possession became adverse. The court erred in ejecting Richard from the property.

---

[46] See *id.*, § 144.

[47] See *Leo Egan Land Co., Inc. v. Heelan, supra* note 40, 210 Neb. at 268, 313 N.W.2d at 685 (internal quotation marks omitted).

[48] See 3 Joyce Palomar, Patton and Palomar on Land Titles § 563 (3d ed. 2003).

[49] See, § 25-202; *Leo Egan Land Co., Inc. v. Heelan, supra* note 40.

### (b) Other Assignments

[19] Richard's remaining assignments were contingent upon this court's finding that the district court did not err in ejecting Richard from the property. Because we have reversed the court's action, we decline to address those other assignments. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the case and controversy before it.[50]

## VI. CONCLUSION

Lola could not wait for 17 years, after Richard stopped making payments and demanded the deed, to assert her contractual rights. Lola's specific performance claim was barred by the applicable statute of limitations. Additionally, Lola could not eject Richard from the property, because she contracted away her right to possess the property, and Richard had adversely possessed the property. Therefore, we reverse the district court's judgment and remand the cause with direction to dismiss.

Reversed and remanded with direction.

---

[50] *City of Lincoln v. County of Lancaster*, 297 Neb. 256, 898 N.W.2d 374 (2017).